**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DOMINIK WEBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:19-cv-00704 |
| v. | ) |
| | ) |
| PNC INVESTMENTS LLC, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Justice Felix Frankfurter once wrote: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Tr. Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting). The problem for Plaintiff Dominik Weber is that sometimes the Court is bound to reject late breaking ideas regardless of their wisdom. Weber brought a claim in arbitration against PNC Investments, LLC. He lost that claim, and now asks this Court to overturn the arbitration award because two (2) of the three (3) arbitrators who presided in his case should have been excluded based on the terms of Weber's contract with PNC Investments. For PNC Investments, this is the first its hearing of Weber's concerns. That is because Weber never raised the issue during his arbitration, despite having the opportunity to do so. Under binding Third Circuit precedent, Weber waived the right to object now. And Weber's second ground for vacatur—that PNC Investments is a state actor bound by the Pennsylvania Constitution's Due Process Clause—lacks merit. For these reasons, and those that follow, Weber's Motion to Vacate (ECF No. 1), is **DENIED**, and PNC Investments' Cross-Motion to Confirm (ECF No. 18), is **GRANTED**.

1

## I. FACTS & PROCEDURAL HISTORY

The facts underlying Weber's claims against PNC are mostly outside of the Court's tasks today. Yet they provide some helpful context. Weber started working for PNC Bank as a teller at a branch in North Hills, Pennsylvania in late 2014. He earned several promotions, and in 2016 a new opportunity for advancement arose. That is when PNC Investments LLC, a wholly owned subsidiary of PNC Bank, sponsored Weber to take the Financial Industry Regulatory Authority ("FINRA") Series 7 and 66 license exams.[1] Passing those exams would make Weber eligible for promotions that required the FINRA securities licenses.

Weber passed his Series 7 exam in June 2014, and signed up to take his Series 66 exam that coming September. (ECF No. 1, at ¶24, 34.) As part of the Series 7 licensing process, Weber signed a FINRA Uniform Application for Securities Industry Registration—or as it is known in finance industry jargon, a Form U4. (*Id.* at ¶¶25–26.) Weber's Form U4 included an arbitration agreement, providing that the FINRA Code of Arbitration Procedure for Industry Disputes ("FINRA Rules") would apply in any future arbitration.[2] (*Id.* at ¶28; ECF No. 18-1.)

FINRA arbitration rules differ depending on who is involved in the claim. When an "associated person," like Weber, brings a claim against a FINRA member firm, FINRA Rule 13402(b) applies. (ECF No. 1, at ¶126.) Under that rule, if Weber took PNC Investments to

---

[1] FINRA oversees professional licensing for anyone who sells a securities product. Part of that oversight involves administering professional licensure examinations, like the Series 7 and 66 exams. FINRA requires that applicants for certain securities licenses be sponsored by a FINRA member firm. PNC Bank is not a FINRA member, but PNC Investments is. So PNC Bank uses its subsidiary, PNC Investments, to sponsor and hold FINRA licenses for some of its employees.

[2] In whole, the Form U4 arbitration clause reads:

> I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

(ECF No. 18-1, at 15.)

2

arbitration, the panel hearing the claim would be made up of three (3) arbitrators—one (1) non-public arbitrator and two (2) public arbitrators. (*Id.* at ¶134.) One (1) of those public arbitrators would serve as the panel's chairperson. (*Id.*) The FINRA Rules define both "non-public arbitrator"—basically, a financial services industry insider—and "public arbitrator"—someone with much more limited connection to the financial services industry. *See* FINRA Rule 13100(r), (x).

Weber signed the Form U4 in May 2016. (ECF No. 18-1.) What happened in the following months is a matter of substantial disagreement between the Parties. Weber claims that shortly before he was to sit for his Series 66 exam, he complained to his supervisor about what he considered to be improper sales practices occurring at PNC Bank. According to Weber, he became the target of hostility and conspiracy for raising the complaint. (ECF No. 1, at ¶¶36–125.) PNC Investments, on the other hand, claims that throughout the late summer and early fall of 2016, Weber lied to his supervisors on several occasions about varying topics. His repeated lies, PNC Investments says, led the company to open a human resources investigation into Weber. (ECF No. 18, at ¶¶5–11.) Both Weber and PNC Investments do agree on what followed: PNC Bank fired Weber in early October 2016. (ECF No. 1, at ¶68; ECF No. 18, at ¶11.)

Here is where the facts become most relevant to today's task: in January 2017, Weber filed a Statement of Claim with FINRA—and later filed an Amended Statement of Claim that February. (ECF No. 1, at ¶¶103, 120.) Weber claimed that PNC Investments and PNC Bank defamed him and intentionally interfered with his prospective contractual relations. Bound by his Form U4 arbitration agreement, Weber's claim proceeded under FINRA's arbitration rules—meaning that two (2) public and one (1) non-public arbitrators would hear his claim. Under the FINRA Rules,

3

Weber and PNC Investments[3] had an opportunity to choose the three-arbitrator panel from a FINRA selection list. (*Id.* at ¶131.) Because this case turns on who knew what and when, the sequence of events, starting with FINRA sending the arbitrator selection list to the Parties and ending with the Panel's award, matters a great deal. And as to these events, the Parties are in agreement as to their substance and timing.

**April 12, 2017**—FINRA sent a list of potential arbitrators to the Parties. That list included ten (10) potential non-public arbitrators, ten (10) potential public arbitrators, and ten (10) potential public chairpersons. FINRA's correspondence informed Weber and PNC Investments of their right to rank and object to the potential arbitrators. Also included in FINRA's correspondence were the disclosure forms for each potential arbitrator—including Gregory Mathews, who ultimately served as the public chairperson for Weber's hearing. Mathews's report disclosed prior employment with Wachovia Corporation as a senior vice president and in-house counsel, and as an attorney for the Securities and Exchange Commission ("SEC") in the late 1970s and early 1980s. (ECF No. 18, at ¶¶17–19; ECF No. 18-7, at 2.) Notwithstanding Mathews's legal work for Wachovia and the SEC, Weber did not object to Mathews's classification as a potential public chairperson.

**May 5, 2017**—After the Parties sent in their rankings and objections, FINRA compared the lists and selected the three (3) panelists. Gregory Mathews would serve as the public chairperson, William Ryan as the public arbitrator, and Joseph Schwaba as the non-public arbitrator. (ECF No. 1, at ¶¶150, 153; ECF No. 18, at ¶18.) Weber did not object to any of the arbitrators' classifications.

**June 3, 2017**—Ryan, after being selected as the public arbitrator, provided his Oath of Arbitrator. That form, meant to ensure that arbitrators comply with certain ethical obligations,

---

[3] PNC Bank, because it is not a FINRA member, elected not to take part in the FINRA arbitration.

4

elicited three (3) relevant disclosures. First, Ryan informed Weber and PNC Investments that he had checking and savings accounts with PNC Bank. Second, he informed the Parties that his company used PNC Bank as well. Third, he told the Parties that his son worked as a teller for PNC Bank for a little over a year before recently being promoted to an operations analyst. Ryan affirmed that none of those facts would influence his decision in Weber's case and remained classified as a public arbitrator. He also affirmed that he had no involvement with PNC Investments. (ECF No. 18-9, at 14.) Two (2) weeks later, FINRA provided Ryan's Arbitrator Disclosure Report, which flagged the same three (3) conflicts. (ECF No. 18-10, at 2–3.) Weber did not object to Ryan's classification as a public arbitrator.

**July 30 to August 13, 2018**—FINRA scheduled Weber's Arbitration to last five (5) days beginning on July 30. But when it came time to begin the arbitration, Schwaba—the non-public arbitrator selected for the panel—was nowhere to be found. (ECF No. 1, at ¶178.) PNC Investments refused to proceed with only Mathews and Ryan hearing Weber's claim, so FINRA continued the proceeding. (*Id.* at ¶179.) With Schwaba out of the picture, it was "next man up." FINRA went back to the Parties' arbitrator selection lists and appointed Peter Marcoline as the new non-public arbitrator.[4] (*Id.* at ¶¶180–83.) Back at a full roster of arbitrators on the panel, FINRA rescheduled Weber's hearing for late January 2019.

**January 8, 2019**—Shortly before the rescheduled hearing, FINRA provided an updated disclosure report for Mathews, current through late September 2018. That updated report informed Weber and PNC Investments that Mathews was counsel for a group of plaintiffs in a Ponzi scheme-related civil case litigated during 2017 and 2018. Aside from that piece of information, Mathews's

---

[4] Neither Weber nor PNC Investments dispute Schwaba and Marcoline's classification as non-public arbitrators. Schwaba's odd disappearance is included here simply to explain why it took so long for Weber's claim to work its way through the FINRA arbitration process.

5

disclosure report remained materially unchanged, so the arbitration proceeded as scheduled with Mathews as the public chairperson. (ECF No. 18-8, at 9.) Weber still did not object to Mathews's classification.

**January 28 to 31, 2019**—Mathews, Ryan, and Marcoline (collectively, "the Panel") presided over Weber's hearing. At the beginning of the hearing, after confirming that his and his fellow panelists' disclosures were up-to-date, Mathews asked counsel whether they knew "of any reason why th[e] Panel should not be confirmed." PNC Investments' counsel answered: "None." And Weber's counsel answered: "None for the Claimant." (ECF No. 18-13, at 5:19–6:22.) With that, the Panel began hearing Weber and PNC Investments' arguments, listening to their witnesses, and taking their exhibits.[5] Four (4) days after it began, Weber submitted his case to the Panel for a decision and the hearing closed. (ECF No. 1, at ¶187.)

**February 13, 2019**—The events of this date are the meat of the matter. Two (2) weeks after Weber's hearing concluded, but before the Panel issued its award, FINRA informed the Parties that "Ryan's classification has changed from Public to Non-Public." He would "remain on the panel," because FINRA stated the "reclassification will apply to the arbitrator's future case appointment, and does not affect the arbitrator's classification in this case." FINRA's notice listed a phone number and email address for the Parties to direct any questions about Ryan's reclassification. FINRA did not tell Weber or PNC Investments what triggered Ryan's reclassification. In fact, Weber and PNC Investments both admit that they still do not know the reason behind FINRA's decision. Nor did FINRA explain how the reclassification could affect Ryan's future appointments, but not his status in Weber's dispute. (ECF No. 18-11.)

---

[5] Weber takes issue with the Panel's refusal to admit some of his evidence. (ECF No. 1, at ¶186.) Because the Court ultimately concludes that Weber's motion fails on waiver grounds, the Court need not detail the nitty-gritty of Weber's evidence during the hearing.

**March 18, 2019**—Nothing happened for more than a month after FINRA sent its vague notice reclassifying Ryan as non-public for future arbitrations but leaving him as a public arbitrator on Weber's panel. Weber did not object to FINRA's reclassification, nor did he seek to remove Ryan from the Panel. Neither did PNC Investments. So the Panel apparently continued deliberating, and in mid-March it issued its award: total defeat for Weber, total victory for PNC Investments. Perhaps more distressing for Weber, the Panel assessed $12,600 in hearing fees to him. All three (3) arbitrators—Mathews, Ryan, and Marcoline—signed the award form. (ECF No. 18-14.) With that, Weber's FINRA arbitration ended.

Finding no luck in arbitration, Weber moved this Court to vacate the Panel's award. (ECF No. 1.) PNC Investments answered and cross-moved to confirm the award. (ECF Nos. 17; 18; and 19.) Weber replied to PNC Investments' motion. (ECF No. 25.) And the Court scheduled oral argument. (ECF No. 28.)

At oral argument, two (2) issues jumped out to the Court. First, the Parties' motions and answers at oral argument left the Court concerned that it may not have subject matter jurisdiction to hear this case. Second, it became clear that the Court needed to know whether FINRA Rules even provided a way for Weber to object the arbitrators' classification—since whether Weber waived his right to object to Mathews and Ryan's classification appeared to be dispositive to the resolution of these matters. Although the Parties' briefs touched on these issues, the Court felt more detailed discussion of its subject matter jurisdiction and waiver during arbitration would help. So the Court ordered short supplemental briefing. (ECF Nos. 32 and 33.) That supplemental briefing is complete, (ECF Nos. 35; 36; and 38), and the Court now decides the motions.

## II.    SUBJECT MATTER JURISDICTION

It goes without saying that subject matter jurisdiction is a "must have" in every case brought before an Article III Court. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). When the Court read Weber's Motion to Vacate and PNC Investments' Cross-Motion to Confirm the Award, it was left wondering whether it had the power to hear Weber's case. Weber argued throughout that this Court can decide his case without offending Article III of the United States Constitution. At oral argument, PNC Investments told the Court that subject matter jurisdiction was lacking. But in its supplemental brief, PNC Investments, having had the benefit of more time to examine the issue, changed course and joined Weber's position that the Court can hear the case. In the end, the Court concludes that it does have subject matter jurisdiction. But it is worth explaining that conclusion, since the Court's uncertainty stemmed from an all-to-common, yet easily fixable, gap in Weber's initial pleading.

Here are the basic jurisdictional facts: Weber is an Austrian citizen who lawfully resides in Gibsonia, Pennsylvania. (ECF No. 1, at ¶1.) His Motion to Vacate invokes the Federal Arbitration Act ("FAA") and the Pennsylvania Constitution's Due Process Clause. PNC Investments, LLC, as its name suggests, is a limited liability company. (*Id.* at ¶2.) PNC Investments' sole member is PNC Bank, National Association ("PNC Bank")—a national banking association, or "national bank" as such entities are often called, chartered by the federal Office of the Comptroller of the Currency ("OCC"). (ECF Nos. 34-1; 38; and 38-1.)

Congress has generally provided plaintiffs with two (2) principal routes into federal court. First, by pleading a federal question—that is, a claim arising under the Constitution, laws, or treaties of the United Sates. *See* 28 U.S.C. § 1331. Second, by invoking the Court's diversity jurisdiction—i.e., raising a state law claim where no plaintiff is a citizen of the same state as any

defendant, and pleading an amount in controversy over $75,000 (not including costs and interests). *See* 28 U.S.C. § 1332(a). Weber and PNC Investments tell the Court that diversity jurisdiction applies here, since Weber's claims arise under state law.[6] Because there is no question that Weber easily meets § 1332's amount in controversy requirement, all that is left is for the Court to ensure that Weber and PNC Investments are not citizens of the same state. *See id.* § 1332(a).

Determining Weber's citizenship is simple. For a natural person like Weber, "[c]itizenship is synonymous with domicile." *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006) (citing *Vlandis v. Kline*, 412 U.S. 441, 454 (1973)). Weber lives in Gibsonia, Pennsylvania. (ECF No. 1, at ¶1.) And although he is an Austrian citizen, he is treated as a Pennsylvania citizen for diversity jurisdiction purposes because he lawfully resides in the United States. *See* 28 U.S.C. § 1332(a)(2). That means that the Court has diversity jurisdiction over this case only if PNC Investments is not also a citizen of Pennsylvania. *See id.*

In determining PNC Investments' citizenship, Weber's Motion to Vacate left the Court guessing at its subject matter jurisdiction. Weber alleged: "PNC Investments, LLC, is a Delaware Limited Liability Company, with a registered agent located at 251 Little Falls Drive, Wilmington, DE 19808." (ECF No. 1, at ¶2.) But that does not tell the Court anything legally meaningful about PNC Investments' citizenship for diversity purposes. After all, our Court of Appeals in *Zambelli*

---

[6] Weber and PNC Investments correctly note that, although Weber's Motion to Vacate relies on a federal statute, 9 U.S.C. § 10(a), his complaint does not plead a federal question. That is because motions to vacate an arbitration award under the FAA present "something of an anomaly in the field of federal-court jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 n.32 (1983). When Congress passed the FAA, it created a uniform regulatory framework for enforcing arbitration agreements. *See id.* But that framework did not create independent federal question jurisdiction. *See id.*; *V.I. Hous. Auth. v. Coastal Gen. Const. Servs. Corp.*, 27 F.3d 911, 915 (3d Cir. 1994) (The FAA "does not supply federal jurisdiction where it does not otherwise exist."). Because the FAA does not provide a basis for subject matter jurisdiction, the Court must apply the traditional well-pleaded complaint rule to the plaintiff's motion to vacate. *See Goldman v. Citigroup Glob. Mkts. Inc.*, 834 F.3d 242, 250, 555 (3d Cir. 2016) ("We must look, then, to the [plaintiff's] allegations to see whether they somehow raise a basis for jurisdiction, other than by the incorrect assertion that § 10 independently provided the District Court 'jurisdiction to hear and decide' the motion to vacate."). Because Weber's claims against PNC Investments sound in contract and tort, they do not arise under federal law. Thus, federal question jurisdiction does not exist in Weber's case.

*Fireworks Mfg. Co. v. Wood*, instructed that like other unincorporated business entities, a limited liability company does not have independent citizenship under § 1332. *See* 592 F.3d 412, 418 (3d Cir. 2010). Instead, the Third Circuit "and every other Circuit Court to face the question have held that the citizenship of a limited liability company 'is determined by the citizenship of each of its members.'" *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013) (quoting *Zambelli*, 592 F.3d at 418). So telling the Court where PNC Investments has a registered agent does nothing to ensure the Court that none of the company's members are citizens of Pennsylvania.

Weber is not alone in erroneously pleading a limited liability company defendant's citizenship, as there have been many cases on the Court's docket where the plaintiff failed to account for *Zambelli*'s unambiguous holding.[7] While this might seem like the Court is picking nits, the implications of ignoring *Zambelli* are more serious than first meets the eye. For starters, federal courts are tribunals of limited jurisdiction. *See* U.S. Const. art. III, § 2. There is a lot the Court can do with its limited jurisdiction, but nothing it can do without it. Exercising power not granted by statute offends Congress's authority to set the jurisdiction of federal courts and displaces state courts that should rightfully hear the claim. *See* U.S. Const. art. III, § 1; *Allapattah*, 545 U.S. at 552. As a more practical concern, there is no time limit on moving to dismiss a case under Rule 12(b)(1). *See* Fed. R. Civ. P. 12(h)(3). And even the most final of judgments is subject

---

[7] Pleading a limited liability company's citizenship is not as hard as it might seem. When the plaintiff knows all of the limited liability company's members, it can affirmatively plead the citizenship of each member. *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 106–10 (3d Cir. 2015). If the plaintiff, after reasonable effort, cannot identify the limited liability company's members, the Third Circuit allows the plaintiff to "allege that the defendant is *not* a citizen of the plaintiff's state of citizenship." *Id.* at 107. The Third Circuit crafted this pleading rule specifically to address the fact that "[t]he membership of an LLC is often not a matter of public record." *Id.* at 108. By negatively pleading the limited liability company's citizenship, the onus is on the defendant to admit or deny its members' citizenship. On the other hand, when a party incorrectly pleads the limited liability company's citizenship the way Weber did here, the defendant company is never forced to admit or deny the citizenship of its members—leaving the Court in the dark.

to attack if entered without jurisdiction. *See* Fed. R. Civ. P. 60(b)(4). That offends the parties' ability to rely on a judgment and represents a potentially colossal waste of federal court resources.

With the knowledge that a limited liability company has the citizenship of its members, the Court must ask, who are PNC Investments' members? At oral argument and in its supplemental briefing, PNC Investments informed the Court that it had a single member: PNC Bank. (ECF No. 38, at 1–2.) That means PNC Investments derives its citizenship entirely from PNC Bank—which as the Court noted earlier, is a national bank chartered by the OCC.

Whereas a state-chartered bank, like any other corporation under 28 U.S.C. § 1332(c), is a citizen of every state where it is incorporated and the one (1) state where it maintains its principal place of business, the same is not true for national banks. Instead, Congress passed a statute specifically addressing the citizenship of national banks. *See* 28 U.S.C. § 1348. In relevant part, that statute instructs that "all national banking associations shall . . . be deemed citizens of the States in which they are respectively located." *Id.* Recognizing that the term "located" is open to interpretation, the Supreme Court held "that a national bank, for § 1348 purposes, is a citizen of the State in which its main office, as set forth in its articles of association, is located." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006).

The articles of association for PNC Bank show that its main office is located in Wilmington, Delaware—making it a Delaware citizen for diversity purposes. (ECF No. 38-1, at 2.) Because PNC Bank is a citizen of Delaware, PNC Investments is also a citizen of that state. *See Zambelli*, 592 F.3d at 418. The question remains whether PNC Bank is a citizen of any other state. As the Supreme Court observed in *Wachovia*, Congress originally enacted § 1348 to create jurisdictional parity between national and state banks. 546 U.S. at 309–12. But over time, Congress amended the citizenship rules for state banks, now codified at § 1332(c), without similarly

11

updating § 1348. Most important for the Court's determination today, Congress instructed that a state bank is a citizen of the state "where it has its principal place of business," 28 U.S.C. § 1332(c)(1), but did not amend § 1348 to include reference to a national bank's principal place of business. *See id.* § 1348. In *Wachovia*, the Court noted the discrepancy between § 1332(c)(1) and § 1348, but declined to decide whether a national bank, like a state bank, is also a citizen of the state where it has its principal place of business. *See Wachovia*, 546 U.S. at 317 n.9. Instead, the Supreme Court observed that the difference "may be of scant practical significance for, in almost every case, . . . the location of a national bank's main office and of its principal place of business coincide." *Id.*

Here, PNC Bank's main office and principal place of business do not coincide. And because PNC Bank's principal place of business is in Pennsylvania—Weber's state of citizenship—*Wachovia*'s open question is hardly of scant significance.[8] To the contrary, if the Court concludes that a national bank is a citizen of the state where it has its principal place of business, then the Court must dismiss this case for lack of complete diversity. The Third Circuit is yet to address this issue in a precedential opinion.[9] Without any binding precedent on point, the Court is left with only persuasive authority to guide its interpretation of § 1348.

---

[8] Though not citing *Wachovia* or § 1348, PNC Investments based its statement at oral argument that the case lacked complete diversity on the fact that PNC Investments' principal place of business is in Pittsburgh, Pennsylvania. In its supplemental briefing, PNC Investments walked back its position that a national bank's principal place of business matters for its diversity jurisdiction citizenship. In the Court's estimation, because the argument goes to its subject matter jurisdiction, and there is no binding Third Circuit law on the issue, it is proper to address § 1348's scope despite the Parties' eventual agreement that there is diversity jurisdiction here.

[9] In *Liptok v. Bank of Am.*, an unpublished Third Circuit decision, the Court of Appeals stated that "Bank of America is a citizen of North Carolina, where it maintains its *principal place of business*." 773 F. App'x 97, 99 (3d Cir. 2019) (emphasis added). But to support that proposition, the Third Circuit quoted *Wachovia*'s holding that "a bank's citizenship is determined by the place designated in the bank's articles of association as the location of its main office." *Id.* (citing *Wachovia*, 546 U.S. at 306–07). In the Court's estimation, the Court of Appeals reference to Bank of America's "principal place of business" loosely interchanged that term with the bank's "main office." It strikes the Court that, given the Third Circuit's cite to *Wachovia* immediately following the quoted sentence, the panel did not intend to break any ground left untouched by *Wachovia*. But no matter the true meaning, *Liptok* is unpublished, and

12

While our Court of Appeals has not weighed in on the significance of a national bank's principal place of business, several others have. Those decisions uniformly hold that a national bank is a citizen *only* of the state where its main office is located. *See OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 216 (2nd Cir. 2016) (per curiam); *Rouse v. Wachovia Mortgage, FSB*, 747 F.3d 707, 708 (9th Cir. 2014); *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 710 (8th Cir. 2011); *see also Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by RTP LLC v. ORIX Real Estate Capital, Inc.*, 827 F.3d 689, 690 (7th Cir. 2016).

The Second Circuit's decision in *OneWest Bank* provides a particularly well-reasoned example of the post-*Wachovia* case law. *See OneWest Bank*, 827 F.3d at 219–22. There, the Second Circuit held that limiting a national bank's citizenship to the state where its main office is located "is consistent with both the statutory history of § 1348 and canons of construction." *Id.* at 219. Section 1348's current text, of course, contains no reference to a bank's "principal place of business." *See* 28 U.S.C. § 1348. Instead, it simply references where the national bank is "located"—a term with "no enduring rigidity." *Wachovia*, 546 U.S. at 314. Interpreting the statute, the Second Circuit applied the traditional rule that "[t]he meaning of a statute's terms is to be determined as of the time that it became law." *OneWest Bank*, 827 F.3d at 220 (citing *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994)). And when the Congress inserted the term "located" into § 1348, "the statutory concept of 'principal place of business' had not yet come into existence." *Id.* Thus, the Second Circuit concluded that it could not interpret "located" to encompass a national bank's principal place of business. *Id.*; *see also WMR e-PIN*,

---

therefore does not bind this Court. *See* U.S. Court of Appeals for the Third Circuit, *Internal Operating Procedures* § 5.3 (2018).

13

653 F.3d at 709 ("We will not import a jurisdictional concept into § 1348 that was unknown at the time of its adoption.").

Section 1348's statutory history confirms the Court's reading of its text. When Congress first enacted the predecessor to § 1348 in 1882, it did so to create jurisdictional parity between state and national banks.[10] *See Leather Mfrs.' Nat'l Bank v. Cooper*, 120 U.S. 778, 781 (1887). At that time, Congress explicitly tied together the ability of federal courts to exercise jurisdiction over state banks and national banks. *Id.* But as the Second Circuit recounted in *OneWest Bank*, Congress removed the "language tying national bank jurisdiction to state bank jurisdiction" in 1887. *OneWest Bank*, 827 F.3d at 219. Instead, Congress used the 1887 amendment to "evoke[] jurisdictional parity between national banks and individual citizens." *Id.* (citing Act of Mar. 3, 1887, ch. 373, § 4, 24 Stat. 552, 554–55). And it was Congress' 1887 amendment where the term "located" made its first appearance. *See Wachovia*, 546 U.S. at 311 n.6. (citing § 4, 24 Stat. at 554– 55).

Decades later, Congress again amended the citizenship rules for national banks—this time combining "two formerly discrete provisions on proceedings involving national banks." *See id.* at 311–12 (citing Act of Mar. 3, 1911, ch. 231, § 24 (Sixteenth), 36 Stat. 1087, 1092–93). But Congress kept the language from the 1887 Act deeming national bank's to be "citizens of the States in which they are respectively located." *Id.* (citing § 24 (Sixteenth), 36 Stat. at 1092–93). Finally, in 1948, Congress amended the national bank citizenship statute into its current form. *Id.* (citing Act of June 25, 1948, ch. 646, § 1348, 62 Stat. 869, 935–34). The current version of § 1348, as the *OneWest Bank* Court observed, came into existence a decade before Congress first enacted the rule

---

[10] Prior to the 1882 Act, national banks could "sue and be sued in the federal district and circuit courts solely because they were national banks, without regard to diversity, amount in controversy or the existence of a federal question in the usual sense." *Mercantile Nat'l Bank at Dall. v. Langdeau*, 371 U.S. 555, 566 (1963). The 1882 Act, however, "ended national banks' automatic qualification for federal jurisdiction." *Wachovia*, 546 U.S. at 310.

that state banks, and other corporations, are citizens of the state where they have their "principal place of business." *OneWest Bank*, 827 F.3d at 220 (citing Act of July 25, 1958, Pub. L. No. 85-554, 72 Stat. 415 (codified as amended at 28 U.S.C. § 1332(c)(1)). Congress, to this day, has not amended § 1348 to include a similar reference—although it is undoubtedly capable of doing so.

The Court adopts the reasoning of the Second, Seventh, Eighth, and Ninth Circuits—concluding that a national bank's principal place of business is legally irrelevant. All that matters under § 1348 is the location of the national bank's main office listed in its articles of association. For PNC Bank, that is Delaware. Thus, PNC Bank is citizen of only that state, and because it derives its citizenship entirely from PNC Bank, the same is true for PNC Investments.

All this is an admittedly long-winded way of saying that Weber is a citizen of Pennsylvania and PNC Investments is a citizen of Delaware. Those two (2) facts—coupled with the Court's determination that Weber's Motion to Vacate pleads an amount in controversy over $75,000, exclusive of costs and interest—leads the Court to conclude that it has subject matter jurisdiction under 28 U.S.C. § 1332 to hear Weber's case.

## III.  DISCUSSION

Weber's Motion asserts two (2) grounds for the Court to vacate the Panel's award. First, Weber argues that neither Mathews nor Ryan were truly public arbitrators—even though Weber's contract promised him a panel comprised of two (2) public and one (1) non-public arbitrators—so the Court should vacate his award under 9 U.S.C. § 10(a). Second, Weber argues that the Court should vacate his award because PNC Investments' participation in FINRA's licensing process violated his rights under the Pennsylvania Constitution. The Court concludes that Weber's state constitutional claim is without merit, and that he waived his § 10(a) arguments as to both Ryan

15

and Mathews's classification. As a result, Weber's Motion to Vacate is denied, and PNC Investments' Cross-Motion to Confirm is granted.

## A. Federal Arbitration Act

Weber's FAA-based argument for why the Court should vacate his award is straightforward: his contract with PNC Investments promised him a panel made up of two (2) public and one (1) non-public arbitrators, but instead three (3) non-public arbitrators presided over the disposition of his complaint. Thus, he argues that the award must be vacated under 9 U.S.C. § 10(a). PNC Investments' response is twofold. First, PNC Investments broadly argues that FINRA has ultimate authority to interpret its rules and classify arbitrators. So because Weber agreed to arbitrate by FINRA rules, when FINRA said that Ryan's new non-public classification only applied to cases going forward, Weber was bound by that determination. Second, PNC Investments argues that, whatever problem there may be with FINRA's late reclassification of Ryan, Weber waived the issue when he failed to object to either arbitrators' classification during the arbitration. The Court concludes that PNC Investments' second argument carries the day.

Arbitration awards are presumptively enforceable. *See Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005). But the FAA outlines four (4) scenarios when a district court may vacate an arbitration award. *See* 9 U.S.C. § 10(a). First, "where the award was procured by corruption, fraud, or undue means." *Id.* § 10(a)(1). Second, "where there was evident partiality or corruption in the arbitrators, or either of them." *Id.* § 10(a)(2). Third, "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." *Id.* § 10(a)(3). Or fourth, "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final,

16

and definite award upon the subject matter submitted was not made." *Id.* § 10(a)(4). Weber argues that the second, third, and fourth of these scenarios occurred during his arbitration with PNC Investments—though he primarily relies on the fourth.[11]

Based on the briefing and oral argument, it appears to the Court that Weber had a more than colorable right to a panel with two (2) public arbitrators. And it is far from clear that Weber actually received the benefit of his bargain. PNC Investments' first argument, that this Court *must* defer to FINRA's classification, no matter how eyebrow-raising, is unpersuasive.[12] Unfortunately for Weber, PNC Investments' waiver argument is persuasive. He had a genuine chance to raise any issues surrounding Mathews and Ryan's classifications during the arbitration, yet he failed to do so.

It is a principal of our legal system that parties should flag issues sooner rather than later. Applying waiver principles may sometimes seem harsh, but the preference for timely objections rests on sound logic—it gives the tribunal a chance to correct errors early in the process. The alternative is to wait until late in the game, or even after the final buzzer sounds, to raise a game-changing issue that could have and should have been dealt with far earlier in the process. The same logic applies in the context of arbitration. *See Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 148–49 (3d Cir. 2015).

---

[11] As for PNC Investments' Cross-Motion to Confirm (ECF No. 18), the Court "must grant" the Motion "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. So unless the Court grants Weber's Motion to Vacate, then, the Court will grant PNC Investments' Motion to Confirm. *Cf. D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006).

[12] Whatever the efficiency goals of arbitration may be, the process for fairly selecting arbitrators—who essentially take on the role of judge and jury—needs to place claimants in a better position than Charlie Brown lining up for yet another big kick, in which the football is yanked away at the last moment. *Accord Matteson v. Ryder Sys. Inc.*, 99 F.3d 108, 113 (3d Cir. 1996) ("Effusively deferential language notwithstanding, the courts are neither entitled nor encouraged simply to 'rubber stamp' the interpretations and decisions of arbitrators.").

17

Our Court of Appeals has adopted a "constructive knowledge" standard for waiver of objections during arbitration. That means "if a party could have reasonably discovered that any type of malfeasance . . . was afoot during the [arbitration] hearings, it should be precluded from challenging the subsequent award on those grounds." *Athena Venture*, 803 F.3d at 149. In other words, a party who learns of a problem during arbitration (or reasonably should learn of the problem) cannot stay quiet until the award comes down, and only then raise the issue in the face of defeat. This standard, the Third Circuit held, "both encourages parties to conduct adequate due diligence prior to issuance of the award and promotes the arbitration goals of efficiency and finality." *Id.*

The facts in *Athena Venture*, our Circuit's foremost arbitration waiver case, are instructive in considering Weber's case. There, "Goldman Sachs and Athena Venture partners participated in [a FINRA] arbitration to settle a $1.4 million investment-related dispute." *Id.* at 145. After the first hearing session, FINRA informed the parties that one (1) of the arbitrators "had been charged with the unauthorized practice of law in connection with an appearance in a New Jersey municipal court." *Id.* at 146. That arbitrator explained away the indiscretion as an innocent mistake made in the process of helping a family friend in New Jersey. *Id.* at 146 n.4. Neither party objected to that arbitrator's continued participation, and the hearing went forward.

After the panel issued an award for Goldman Sachs, Athena Venture investigated the arbitrator's background. *Id.* What it found was alarming. The arbitrator's disclosure report misled the parties and failed to mention significant legal troubles. Rather than the unauthorized practice of law in New Jersey being a one-off incident, Athena Venture learned that the arbitrator maintained in office in that state and had many other complaints for the unauthorized practice lodged against him there. *Id.* What's more, Athena Venture also learned that the arbitrator

18

committed and admitted to professional misconduct in Michigan. *Id.* at 146–47. And none of this appeared on his arbitrator disclosure forms.

Armed with this information, Athena Venture moved to vacate the award. Goldman Sachs argued that Athena Venture waived its right to disqualify the arbitrator. The District Court sided with Athena Venture, vacating the award under § 10(a)(3) and (4), but the Third Circuit reversed. *Id.* at 147. The Court of Appeals adopted the "constructive knowledge" standard for waiver of issues during arbitration. *See id.* at 148–49. Applying that standard to Athena Venture's case, the Third Circuit identified the dispositive question: "whether Athena knew or could have known about the extent of [the arbitrator's] unauthorized-practice-of-law charge." *Id.* at 149. The Third Circuit concluded that the arbitrator's first disclosure—which admitted to a single New Jersey unauthorized practice charge—provided enough red-flag information to compel the parties to do further research on the arbitrator. *See id.* Even though the arbitrator tried to explain away that particular charge as an isolated indiscretion, the disclosure "should have been enough to set off sirens for both parties, irrespective of the circumstances behind the charge." *Id.*

The Third Circuit had little sympathy for Athena Venture—who waited until it lost to examine the arbitrator's background. Instead, the Court of Appeals issued a warning to future litigants: "[a] party should not be permitted to game the system by rolling the dice on whether to raise the challenge during the proceedings or wait until it loses to seek vacatur on the issue." *Id.* at 150. Along the same lines, parties should not wait until they lose to Google their arbitrators. *See id.* (quoting *Stone v. Bear, Stearns & Co., Inc.*, 872 F. Supp. 2d 435, 457 (E.D. Pa. 2012)). Parties in arbitration, the Third Circuit commented, do not get "a second bite at the apple." *Id.*

The Third Circuit's holding and reasoning in *Athena Venture* apply squarely to Weber's case. Because PNC Investments argues that Weber waived his right to challenge both Mathews and Ryan's classification as public arbitrators, the Court will examine each in turn.

### i. *Mathews's Classification*

Weber argues that Mathews improperly answered "no" when asked on the FINRA Oath of Arbitrator form whether he had ever been associated with a broker dealer and whether he had ever been employed by an entity organized under the Securities and Exchange Act of 1934. (ECF No. 1, at ¶¶153–64; ECF No. 1-33.) Had Mathews answered "yes" to either of those questions, FINRA would have classified him as a non-public arbitrator according to Weber. In his motion, Weber provides three (3) pieces of information that he claims demonstrate Mathews's misconduct.

First, Weber claims that Mathews "worked for a broker dealer (Wachovia) for ten years." (ECF No. 1, at ¶159.) Second, he claims Mathews "worked at the SEC," which Weber argues is an entity organized under the Securities and Exchange Act of 1934. (*Id.*) Third, and finally, Weber claims that Mathews represented a group of plaintiffs in Ponzi scheme-related litigation. (*Id.* at ¶160.) In Weber's estimation, each of these facts provides an independent basis for this Court to conclude that FINRA should have classified Mathews as a non-public arbitrator.

As in *Athena Venture*, the dispositive question here is whether Weber knew or could have known about the extent of Mathews's involvement in the securities industry. The Court answers that question the same way our Court of Appeals did in *Athena Venture*. Weber's counsel knew all three (3) supposedly incriminating facts about Mathews when he told the Panel he knew of no reason why it could not proceed. Mathews disclosed his work experience with Wachovia Bank and the SEC in his arbitrator disclosure report that FINRA sent to Weber in April 2017. (ECF No. 18-7, at 2.) And FINRA informed Weber of Mathews's legal work in the Ponzi scheme case in

January 2019, weeks before the hearing. (ECF No. 18-8, at 9.) So it is difficult to see how Weber can now claim that he had no reason to know of these purported bases to challenge Mathews's classification as the public chairperson.

In the face of PNC Investments' waiver arguments, Weber tries shifting the goalposts. In his reply brief, Weber moves away from his initial argument that Mathews entirely failed to disclose his experience with Wachovia, the SEC, and the Ponzi scheme case, to instead arguing that those disclosures did not raise any alarm warranting further investigation. (ECF No. 25, at 3– 9.) After this about-face, Weber points to information gleaned from Mathews's law firm website profile, and argues that the website does not match up with Mathews's FINRA disclosures. (*Id.* at 7; ECF No. 1-36.) But the Third Circuit's opinion in *Athena Venture* could not be clearer: parties cannot wait until after they lose to look up their arbitrators on the Internet. *Athena Venture*, 803 F.3d at 150. Yet that is exactly what happened here.

Weber implores the Court to be pragmatic. How could his counsel be expected to investigate all of the potential arbitrators on the FINRA selection list? After all, that would take considerable time and effort. (ECF No. 25, at 5 & n.3.) Weber has two (2) things working against his seemingly pragmatic argument. First is our Court of Appeals' binding precedent in *Athena Venture*. Second is the fact that roughly a year and a half passed between Mathews being selected for the Panel and the beginning of the hearing. During that time, Weber knew Mathews would be one (1) of the three (3) people hearing his claim. And he should have known that he would be required to affirm the Panel's ability to proceed at the hearing, so his incentive to investigate the arbitrators remained real. FINRA Rules 13410 and 13411 provided a means for Weber to seek Mathews's removal and replacement based on the information known to him before the hearing.

21

But Weber failed to exercise that mechanism. As a result, the Court concludes that Weber waived his right to object to Mathews's status.

### ii. *Ryan's Classification*

FINRA's post-hearing, pre-award reclassification of Ryan presents a rather unique, if not odd, set of facts. Weber argues that Ryan's post-hearing, pre-award reclassification as a non-public arbitrator for all future arbitrations also meant Ryan could not serve as a public arbitrator in Weber's dispute with PNC Investments. (ECF No. 1, at ¶¶165–72.) At first glance, Weber's argument makes sense: if FINRA needed to reclassify Ryan as a non-public arbitrator for all new arbitrations, how could Ryan serve as a public arbitrator during Weber's ongoing arbitration? The problem is that Weber did not voice these concerns during the arbitration—that is, before the award came down. Instead, like his objections to Mathews's classification, he waited until he lost and raised the issue for the first time in this Court.

Weber's argument as to Ryan differs from his argument about Mathews in one (1) important way: Weber did not learn of Ryan's supposedly disqualifying reclassification until after the Panel heard the case. So the fact that Weber did not raise an objection about Ryan's reclassification when the hearing began cannot be held against him. Yet, despite FINRA's late-in-the-game reclassification, Weber still could and should have objected to Ryan's participation. FINRA reclassified Ryan on February 13, 2019. But the Panel did not issue its award until March 18, 2019. So there was ample time for Weber to consider Ryan's reclassification and make a reasoned objection.

Following oral argument, the Court asked for supplemental briefing on whether the FINRA Rules actually provided a mechanism for objecting to Ryan's participation after the hearing closed

but before the Panel issued its final award. PNC Investments, in its supplemental brief, pointed the Court to FINRA Rule 13410(b), which provides:

> After the first hearing session begins, the Director may remove an arbitrator based only on information required to be disclosed under Rule 13408 that was not previously known by the parties. The Director may exercise this authority upon request of a party or on the Director's own initiative. Only the Director may exercise the authority under this paragraph (b).

FINRA Rule 13410(b). PNC Investments asserts that this rule provided Weber a means to object to Ryan's participation before the final award.[13] Because Weber did not request that the FINRA Director remove Ryan based on his new classification, PNC Investments argues, he waived his right to advance the argument in this Court.

Weber claims that FINRA Rule 13410(b) would not have applied to his objection to Ryan's participation in the arbitration for two (2) reasons. (ECF No. 35, at 5–6.) First, Weber argues that FINRA Rule 13410(b) does not apply after the hearing closes but before the panel issues its award. The text of the rule belies this argument. FINRA Rule 13410(b) provides a definitive start point for its applicability—"After the first hearing session begins." *See* FINRA Rule 13410(b). Yet the text does not include any similar end point. What's more, the use of "*first* hearing session" suggests that the rule drafters contemplated the possibility of multiple hearings, or at least multiple sessions of the same hearing. So the closure of one (1) hearing would not necessarily end FINRA Rule 13410(b)'s applicability. And subsection (a) covers parties' requests to remove arbitrators "[b]efore the first hearing session begins." *See* FINRA Rule 13410(a). Read together, then, subsection (a) and subsection (b)'s text evinces FINRA's intent that Rule 13410 cover the entire

---

[13] Although neither party cites it in their supplemental waiver brief, FINRA Rules also provide a means to substitute in a new public arbitrator in the event the Director removed Ryan. *See* FINRA Rule 13411. Thus, Weber was not faced with a situation where seeking Ryan's removal would deprive him of his contractual right to a three-arbitrator panel.

23

arbitration process from start to finish. As a result, the Court will not adopt Weber's argument that FINRA Rule 13410(b) did not apply when he learned of Ryan's reclassification.

Second, Weber correctly points to language in that rule requiring "information . . . that was not previously known by the parties." *See* FINRA Rule 13410(b). In Weber's estimation, because FINRA never provided its reason for reclassifying Ryan, Weber did not have any new information on which to base a FINRA Rule 13410(b) objection. (ECF No. 35, at 5–7.) And without any new information, Weber says he could not, in good faith, ask the Director to remove Ryan. (*Id.* at 6.)

Weber's argument misses the point. The fact that FINRA reclassified Ryan as a non-public arbitrator for future proceedings was itself a pretty big new piece of information. And Weber could have used that fact to seek Ryan's removal under FINRA Rule 13410(b). Weber argues that even if he had sought Ryan's removal, the Director simply would have denied his request. (*Id.* at 6.) Of course, there is no guarantee Weber's objection would have worked. But *Athena Venture* does not stand for the proposition that parties must win their objections during arbitration in order to preserve the issue. Instead, our Court of Appeals simply requires that parties fairly raise the issue in the first instance. *See Athena Venture*, 803 F.3d at 147–150. Weber failed to do so here.

FINRA's post-hearing reclassification of Ryan should have "set off sirens" for Weber. *Id.* at 144. The reclassification represented a potentially significant change to Weber's panel, and FINRA's complete failure to explain its reasoning should have reasonably caused Weber concern about Ryan's ability to hear his claim. In the Court's estimation, FINRA's rather startling notice—"non-public later, but still public now"—provides exactly the set of facts that the *Athena Venture* Court had in mind when it adopted the "constructive knowledge" waiver standard. It, too, was a blaring "siren." There is simply no reason why Weber should have stayed silent in the face of FINRA's notice. The time to object was then, not now.

24

In the end, Weber knew that FINRA reclassified Ryan from public to non-public for over a month before the Panel issued its award against him. All that time, FINRA Rule 13410(b) provided Weber a means to seek Ryan's removal. Yet Weber stayed silent—only now voicing his objection to Ryan's participation after he lost in arbitration. Our Court of Appeals in *Athena Venture* required parties to raise issues in arbitration about the arbitration process if they later intended to litigate those issues in federal court. Weber failed to heed that directive, and the Court concludes that he waived his right to seek vacatur under 9 U.S.C. § 10(a).

To summarize, Weber waived his right to object to both Mathews and Ryan's classification as public arbitrators. Because his waived objections to those arbitrators' classification are the bases for his Motion to Vacate under 9 U.S.C. § 10(a), the Court cannot grant Weber relief under the FAA.

**B. Pennsylvania Constitutional Claim**

The Court can resolve Weber's second proposed basis for vacating his arbitration award in a straightforward fashion. In his Motion to Vacate, Weber argues that PNC Investments violated his Pennsylvania constitutional rights when it completed FINRA paperwork related to his firing. Weber claims that paperwork defamed him, and FINRA's process for accepting and filing the paperwork deprived him of his reputation without due process. (ECF Nos. 1, at ¶¶204–215; ECF No. 2, at 5–17.) There are a number of problems with Weber's Pennsylvania Constitution claims. The Court will discuss them one-by-one.

First, it is unclear exactly how Weber invokes the Pennsylvania Constitution's Due Process Clause. Some of Weber's arguments, and the types of cases he cites, suggest that he is bringing his state constitutional claim via 42 U.S.C. § 1983—the same way litigants commonly raise federal constitutional harms. (ECF Nos. 1, at ¶¶210, 213; ECF No. 2, at 9–12.) But § 1983 only provides

a vehicle to remedy the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See* 42 U.S.C. § 1983. Accordingly, our Court of Appeals has held that plaintiffs cannot remedy state constitutional harms using § 1983. *See Capogrosso v. Sup. Ct. of N.J.*, 588 F.3d 180, 186 (3d Cir. 2009); *accord Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Second, regardless of what vehicle Weber used to get his Pennsylvania due process claim here, he needs to establish that PNC Investments is a state actor. Otherwise the Pennsylvania Constitution cannot bind PNC Investments' actions toward Weber. *See Commonwealth v. Nat'l Gettysburg Battlefield Tower, Inc.*, 311 A.2d 588, 591 (Pa. 1973). Weber's argument is twofold. First, he argues that FINRA is a state actor, so the Pennsylvania Constitution constricts its process for acquiring information on fired FINRA license holders—using what is known as FINRA Form U5. (ECF No. 2, at 9–15.) Weber then argues that PNC Investments, by sending FINRA the Form U5s for terminated employees, also engaged in state action. (ECF No. 2, at 15–17.) Both assertions lack legal merit.

For starters, every court to examine the issue has held that FINRA is not a state actor. *See, e.g.*, *Santos-Buch v. Fin. Indus. Regulatory Auth., Inc.*, 32 F. Supp. 3d 475, 484 (S.D.N.Y. 2014) ("FINRA Is Not a State Actor"); *see also Epstein v. S.E.C.*, 416 F. App'x 142, 148 (3d Cir. 2010) (NASD, FINRA's predecessor, is not a state actor). That alone is enough to shut down Weber's state constitutional claim. But even if FINRA was a state actor, PNC Investments—unquestionably a private company—would not become a state actor simply by submitting paperwork to FINRA related to its employees who hold FINRA securities licenses. *See generally Leshko v. Servis*, 423 F.3d 337 (3d Cir. 2005) (holding that the fact that private parties are regulated by the state does

not convert them into state actors); *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931–32 (2019) (same).

Third, to the extent that Weber seeks money damages for the harm to a state constitutionally-protected right of reputation under Pennsylvania' Due Process Clause, the Pennsylvania Constitution does not allow for such relief. *See Jones v. City of Phila.*, 890 A.2d 1188, 1209 (Pa. Commw. Ct. 2006) (en banc) ("To date, neither Pennsylvania statutory authority, nor appellate case law has authorized the award of monetary damages for a violation of the Pennsylvania Constitution.").

These defects doom Weber's Pennsylvania Due Process Clause claim. Weber's Motion to Vacate the Award under the Pennsylvania Constitution, then, is denied.

## IV.   CONCLUSION

Weber raised two (2) bases to vacate the arbitration award entered against him. Neither can carry the day. Weber waived his right to object to Arbitrators Mathews and Ryan's classifications. And the Pennsylvania Constitution does not constrain PNC Investments in the way Weber claims. Weber's Motion to Vacate (ECF No. 1), is **DENIED**. And PNC Investments' Cross-Motion to Confirm (ECF No. 18), is **GRANTED**.


Mark R. Hornak
Chief United States District Judge


Dated:   February 5, 2020
cc:      All counsel of record